# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2154

_____

| | |
|---|---|
| United States of  America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Dennis Dinwiddie, also known as D, | * |
| | * |
| Appellant. | * |

_____

No. 09-2649

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

| | |
|---|---|
| United States of  America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Michael D. Meador, | * |
| | * |
| Appellant. | * |

_____

Submitted:   January 12, 2010
Filed:   August 25, 2010

_____

Before LOKEN, Chief Judge,[1] JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Dennis Dinwiddie was convicted of four counts related to a drug conspiracy that resulted in murder. Michael Meador was convicted of three counts related to the same conspiracy. The district court[2] sentenced Dinwiddie and Meador to life imprisonment. In this consolidated appeal, Dinwiddie challenges his conviction and sentence; Meador challenges his conviction. We affirm.

I.

Sergio Burgos Gonzales (Burgos) was part of a conspiracy to distribute marijuana with Dinwiddie and Meador. Burgos shipped marijuana from Texas via express mail services to Dinwiddie in Tennessee and Meador in Missouri. After the marijuana was distributed, Burgos visited Dinwiddie and Meador to collect payment.

On January 25, 2006, Burgos shipped approximately fifty pounds of marijuana to Dinwiddie. Police intercepted the shipment and made a controlled delivery in Clarksville, Tennessee, while surveilling the residence to which the delivery was made. Police observed Dinwiddie outside of the residence, holding what appeared to be a packing slip from the delivery. Police approached him, asking him if he possessed any weapons or drugs. Dinwiddie said no and consented to a search of his

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

[2]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

-2-

person and vehicle.  During the search, police recovered from Dinwiddie's pants pocket a packing slip from one of the packages in the shipment that had just been delivered.  When asked about his involvement in the shipment, Dinwiddie stated that he was a middleman for Burgos.  Police confiscated the marijuana, but did not make any arrests.

Less than a week later, Dinwiddie, Meador, and Burgos met in Tennessee at which time they concocted a plan wherein Meador would travel to Texas with Burgos to purchase more marijuana.  Dinwiddie provided Meador with $10,000 for the transaction.  During the trip, Burgos expressed anger at Dinwiddie and speculated that Dinwiddie might have stolen the drugs that were seized as a result of the controlled delivery.  In Texas, Meador gave Burgos the $10,000 to purchase marijuana and Burgos took the money, promising to do so.  Burgos, however, did not return with the marijuana.

Meador informed Dinwiddie that Burgos had left with the money and failed to return with the drugs as planned.  Meador traveled to Tennessee and was picked up by Dinwiddie in Memphis.  As they drove together to Clarksville, Dinwiddie expressed anger at Burgos.  Meador indicated that he could locate Burgos and agreed to arrange a future meeting between Dinwiddie and Burgos.  After returning to Missouri, Meador spoke with Burgos and told him that they could continue doing business without Dinwiddie.  In March 2006, Burgos shipped a package of marijuana to Meador in Missouri.  Shortly thereafter, Burgos met Meador to collect his payment. Looking forward, they agreed that Burgos would personally bring 200 pounds—a larger than normal amount—of marijuana to Meador in April.

On April 21, 2006, Burgos arrived at Meador's grandmother's house in New Madrid, Missouri, with 200 pounds of marijuana, accompanied by an associate, Raul Cruz.  Meador and Michael Jeremy Hunt, an associate of Meador's, immediately began preparing the marijuana for distribution to local customers and began

distribution that night, collecting $40,000.  The plan was for Burgos to return to the house the following morning to receive payment for the marijuana.  Meador called Dinwiddie to tell him that Burgos was in Missouri.  Dinwiddie acquired a .45 caliber handgun from his girlfriend, Genalle Brown; recruited Lawan James, an old friend, to accompany him; and proceeded to New Madrid.

When Dinwiddie met Meador in New Madrid, they discussed the February 2006 incident in which Burgos absconded with Dinwiddie's $10,000.  Meador encouraged Dinwiddie to confront Burgos.  Meador and Dinwiddie then drove to the hotel at which Burgos was staying.  Meador cautioned Dinwiddie not to confront Burgos at the hotel because of the risk that Burgos might escape.  Dinwiddie complied and returned to Meador's grandmother's house, where, at Meador's direction, he concealed his car behind the house to hide it from Burgos's sight.  At Dinwiddie's request, Meador retrieved his grandmother's .32 caliber handgun and gave it to James.

When Burgos and Cruz approached the house the following morning, Meador directed Dinwiddie, James, and Hunt to hide so that Burgos would not flee at the sight of them.  Meador and Hunt hid in the bathroom.  When Burgos entered the house, he called for Meador.  Dinwiddie confronted Burgos, pistol-whipped him, and forced him into the bedroom, where Dinwiddie demanded to know where the $10,000 was and why Burgos had disappeared with the money.  Burgos said that he had acted out of fear, that his cousin Mario had made off with money, and that it could not be returned.  An argument ensued between Dinwiddie and Burgos about the intercepted drug shipment.

Dinwiddie asked Burgos if he had called him a "bitch," as Meador had related.  Dinwiddie then shot Burgos once in the groin.  Burgos beseeched Dinwiddie to spare his life.  According to James, Dinwiddie replied, "Who's a bitch now?," and shot Burgos again, this time in the head.  Dinwiddie then ordered James to shoot Burgos.

James, using the .32 caliber handgun provided by Meador, shot Burgos once in the back.

Frightened by the commotion, Meador and Hunt broke out of the bathroom window and retrieved guns from a neighboring house.  Meador acquired a shotgun and Hunt picked up a carbine.  Meador directed Hunt to keep the carbine trained on Dinwiddie when he exited the house.  Meador told Hunt to shoot Dinwiddie if he made an aggressive move.  Dinwiddie and Meador spoke and the guns were put down.

At Dinwiddie's direction, James and Cruz loaded Burgos's body into Burgos's car.  Dinwiddie, James, and Cruz drove to a nearby location and discarded Burgos's body in a road-side ditch.  Meador and Hunt cleaned up the room in which Burgos had been murdered, burning bloody linens and Burgos's and Cruz's cell phones.  Dinwiddie gave some of Burgos's marijuana to James and Meador gave some of Burgos's marijuana to Hunt.  Meador told Hunt to lay low for a while and that they could resume the marijuana business with Dinwiddie in the future.  Dinwiddie and James discarded the handguns by throwing them out the window while driving back to Tennessee.  During this ride, James asked Dinwiddie about Dinwiddie's order to shoot Burgos.  According to James, Dinwiddie replied, "Everybody had to play their part."

Burgos's body was found by police shortly after it was discarded.  Police connected Burgos to Dinwiddie based upon a report filed by the Texas Department of Public Safety regarding the intercepted drug shipment in January.  Investigators located Hunt at his sister's house in Dyersburg, Tennessee.  Hunt, fearful for his life, spoke candidly to police about the murder and identified Dinwiddie as one of the perpetrators.  Shortly thereafter, Meador learned that Hunt had spoken to police.  Meador then went to police in St. Genevieve, Missouri, to talk about the murder.  Meador was less than candid, telling police that a group of unknown Haitians had murdered Burgos and denying any personal association with the killers.

-5-

Upon being arrested, James cooperated with investigators and explained what had happened in New Madrid. He led police to the area in Missouri where he and Dinwiddie had discarded the handguns used to kill Burgos. After a multi-day search, police recovered a .45 caliber handgun. Subsequent forensic analysis matched a .45 caliber shell found at the murder scene to the recovered handgun. Police obtained a search warrant for Dinwiddie's residence and an arrest warrant for Dinwiddie. At Dinwiddie's residence, police recovered a pair of blue jeans with blood stains and an April 22, 2006, receipt for gas from a truck stop in Missouri.

Dinwiddie, Meador, James, and Cruz, were indicted on a five-count superseding indictment. The indictment charged Dinwiddie and Meador with: (1) count one, conspiracy to distribute and possess marijuana in excess of fifty kilograms; (2) count two, violation of the Travel Act resulting in death; (3) count three, possession of a firearm in furtherance of a drug trafficking crime resulting in murder. Dinwiddie was also indicted on a fourth count of being a felon in possession of a firearm.

Dinwiddie moved to suppress the packing slip that police found on his person in January 2006, arguing that the search of his person had exceeded the scope of his consent, which he argued extended only to a search for drugs or weapons and not to a search of his pants pocket. The magistrate judge[3] recommended denial of the motion to suppress. The district court adopted the report and recommendation, finding that a reasonable person in Dinwiddie's position would have understood that he was consenting to a search of his pants pockets.

Dinwiddie and Meador were tried separately. At both trials, numerous witnesses testified for the government, relating the facts as set forth above. Dinwiddie's defense was that the government had not proved its case beyond a

---

[3]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri.

reasonable doubt.  He attempted to shift blame to James and cast doubt on the consistency of the witnesses's statements.  Meador's defense was that the government had not proved beyond a reasonable doubt that he had arranged the murder of Burgos or intended it to happen, blaming Dinwiddie for the violence.  In his closing argument, Meador emphasized that he was frightened by the shooting of Burgos and suggested that this did not fit in with the government's portrait of him as conspiring to kill Burgos.

The district court allowed testimony concerning certain out-of-court statements purportedly made by Burgos; James; Genalle Brown; Billy Meador, brother of Michael Meador; and Maria Alanis, Burgos's girlfriend.  The court ruled that these statements were made by co-conspirators in the course of and in furtherance of the drug conspiracy.  Over Meador's objection, the district court curtailed the cross-examination of James as to his *mens rea*.  Dinwiddie and Meador moved for judgment of acquittal on the Travel Act violation, alleging that no conspiracy existed when Dinwiddie crossed state lines en route to kill Burgos.  Meador also moved for judgment of acquittal on the count alleging possession of a firearm in furtherance of a drug trafficking crime resulting in murder, arguing that James lacked the requisite *mens rea* when he shot Burgos with the handgun provided by Meador.  The district court denied the motions, and Dinwiddie and Meador were convicted on the respective counts against them.

The presentence investigation report (PSR) calculated Dinwiddie's base offense level as forty-three, as death had resulted from a violation of 21 U.S.C. §§ 841(b)(1)(C), 846, and 851.  See United States Sentencing Guidelines Manual (U.S.S.G.) § 2A1.1.  Dinwiddie was previously convicted of ten counts of criminal facilitation and one count of trafficking in a controlled substance.  The PSR stated that Dinwiddie qualified as a career offender, under U.S.S.G. § 4B1.1(b), and an armed career criminal, under U.S.S.G. § 4B1.4(c)(2).  Accordingly, the guideline sentence was imprisonment for life.

The PSR calculated Meador's base offense level as forty-three, as death had resulted from a violation of 18 U.S.C. § 1952(a)(2). See U.S.S.G. § 2A1.1. Meador had a prior conviction for driving while intoxicated and a prior conviction for promoting contraband. At the time of Burgos's murder, Meador was still on two separate terms of probation from his prior convictions. Accordingly, the PSR calculated his criminal history category as III. The resulting guideline sentence was imprisonment for life.

Stating that it was "a very close question," the district court overruled Dinwiddie's objection that his prior convictions for criminal facilitation did not qualify as predicate violent offenses under U.S.S.G. § 4B1.1 and 4B1.4. The court accepted Meador's argument that the PSR had overstated his criminal history and reduced his criminal history category to II. The court then sentenced Dinwiddie to 360 months' imprisonment on count one; life imprisonment on counts two and three, to be served concurrently with the 360-month sentence for count one; and life imprisonment on count four, to be served consecutively to the other three terms of imprisonment. The court sentenced Meador to 240 months' imprisonment on count one; life imprisonment on count two, to be served concurrently with the sentence for count one; and life imprisonment on count three, to be served consecutively to the terms of imprisonment for counts one and two.

## II.

### A. Motion to Suppress

Dinwiddie argues that the district court erred in denying his motion to suppress the packing slip found in his pants pocket after the controlled delivery in January 2006. Dinwiddie claims he suffered prejudice because the packing slip bolstered the government's theory that he was involved in a drug conspiracy with Burgos. We review de novo a denial of a motion to suppress. United States v. Cisneros-Gutierrez,

598 F.3d 997, 1003 (8th Cir. 2010).  We review the district court's factual findings for clear error.  Id.

Immediately prior to the search, Officer Clinard observed Dinwiddie exit the residence to which the controlled delivery was made, holding what appeared to be a packing slip.  Clinard asked Dinwiddie if he possessed weapons or drugs.  Dinwiddie said no, whereupon Clinard asked for permission to search Dinwiddie's person and automobile.  Dinwiddie gave his consent.  Clinard testified that he patted Dinwiddie down and that he did not think Dinwiddie had contraband in his pants pocket.  Nonetheless, Clinard reached into Dinwiddie's back pants pocket and discovered the packing slip.

"A consensual search may not exceed the scope of the consent given."  United States v. Rudolph, 970 F.2d 467, 468 (8th Cir. 1992); see also United States v. Dichiarinte, 445 F.2d 126, 129 (7th Cir. 1971) (citing Honig v. United States, 208 F.2d 916, 919 (8th Cir. 1953)).  The scope of consent for a search is limited to what a reasonable person would have understood by the exchange between the investigating officer and the person to be searched.  United States v. Siwek, 453 F.3d 1079, 1085 (8th Cir. 2006) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)).  We have held that when a person gives a general statement of consent to search his vehicle, the scope of consent includes the items about which he was specifically questioned.  Id.  We have not, however, held that the scope of consent automatically excludes items about which the defendant was not questioned.  Id.

Dinwiddie was observed exiting a house to which a controlled delivery of drugs had just been made.  He was observed carrying what appeared to be a packing slip from the just completed drug delivery.  Police officers approached him and asked him if he would consent to a search of his person.  He agreed.  In this context, a reasonable person would have understood his consent to include his pants pocket and the recently observed packing slip therein.

-9-

Dinwiddie disagrees, relying upon language in <u>Siwek</u> to argue that the scope of his consent was limited to the objects about which he was just questioned—weapons and drugs.  At issue in <u>Siwek</u> was whether consent to an automotive search included "any part of the truck" where the contraband that the defendant had just been questioned about might be stored.  453 F.3d at 1085.  <u>Siwek</u> did not hold that the defendant's scope of consent was necessarily limited to only the items mentioned in the predicate questioning.  <u>Id.</u>  Rather, <u>Siwek</u> stated that the scope of consent included a thorough search for those items.  <u>Id.</u>  Accordingly, <u>Siwek</u> is inapposite.

In any event, Dinwiddie is not entitled to any relief on this issue because any error was harmless.  The packing slip and the statements that Dinwiddie made after the search merely supported the existence of a drug conspiracy involving Dinwiddie and Burgos, the evidence of which was overwhelming.

## B.  Motions for Judgment of Acquittal

Dinwiddie and Meador argue that the district court erred in denying their motions for judgment of acquittal.  Dinwiddie alleges that the evidence was insufficient to support his conviction on the Travel Act violation in count two.  He claims that there was insufficient evidence to prove that the interstate travel was in furtherance of an existing marijuana conspiracy.  On the same grounds, Meador alleges that the evidence was insufficient to support his conviction on the Travel Act violation in count two.  Meador also alleges that there was insufficient evidence to support his conviction of the drug conspiracy violation in count three.  The district court's denial of a motion for a judgment of acquittal is reviewed *de novo*.  <u>United States v. Hodge</u>, 594 F.3d 614, 617 (8th Cir. 2010), <u>cert. denied</u>, 78 U.S.L.W. 3714 (June 7, 2010).  We will affirm if the record, viewed most favorably to the government, contains substantial evidence that supports the jury's verdict.  <u>Id.</u>

-10-

Substantial evidence is evidence sufficient to prove all of the elements of the crime beyond a reasonable doubt. Id.

Count two of the indictment alleged that Dinwiddie and Meador had engaged in interstate travel in aid of a racketeering enterprise, in violation of 18 U.S.C. §§ 1952(a)(2) and 2. The government was required to prove: (1) Dinwiddie and Meador traveled, or caused and aided and abetted another to travel in interstate commerce; (2) Dinwiddie and Meador did so with the intent to commit a crime of violence in furtherance of unlawful activity; (3) Dinwiddie and Meador knowingly and willfully committed a crime of violence, or caused and aided and abetted another to do so, in furtherance of the unlawful activity; and (4) the death of Burgos resulted.

### 1.

Dinwiddie and Meador argue that there were two different drug conspiracies in this case. They assert that one conspiracy involving Dinwiddie, Burgos, and Meador existed to distribute marijuana, and that this conspiracy ended when Dinwiddie was cut out of further transactions in February 2006. They argue that a second conspiracy began only in April 2006, when they split up Burgos's marijuana after Burgos's death. Dinwiddie and Meador reason that if there was no conspiracy in existence when Dinwiddie crossed state lines en route to kill Burgos, then no Travel Act violation could have occurred because the travel would not have been in furtherance of an active conspiracy.

In determining whether there was a single conspiracy or multiple conspiracies proved at trial, we look to the totality of the circumstances, including (1) the nature of the activities, (2) the location of the alleged actions of the conspiracy, (3) the identity of the conspirators, and (4) the time frame in which the actions took place. United States v. Smith, 450 F.3d 856, 860-61 (8th Cir. 2006). A single conspiracy

-11-

may exist even if the participants, their activities, and their roles change over time. Id. at 860.

The evidence presented at trial, viewed in the light most favorable to the government, was sufficient to prove that Dinwiddie crossed state lines in furtherance of a single conspiracy to distribute marijuana with Meador. The totality of the circumstances suggests that Dinwiddie and Meador were engaged in a single conspiracy to distribute marijuana and that the killing of Burgos was in retaliation for actions within that same conspiracy. Dinwiddie and Meador were responding to a co-conspirator's misappropriation of funds. The actions in question occurred in the region in which the conspiracy distributed drugs and the killing was done at the family residence of one of the conspirators. The identity of the conspirators was unchanged; the principal players remained Dinwiddie, Meador, and Burgos. The time frame was relatively short; a mere two months had passed between the February 2006 incident and the April 2006 killing. The fact that Dinwiddie was cut out of the drug transactions for a brief period does not prove the existence of a different conspiracy. Individuals may change their roles and activities without creating a new conspiracy. Id. Accordingly, the district court did not err in rejecting Dinwiddie's and Meador's motions for acquittal on the Travel Act violation.

2.

Meador argues that the district court erred in denying his motion for acquittal on count three, which alleged that (1) Meador conspired to distribute and possess with intent to distribute marijuana, (2) Meador knowingly possessed a firearm in furtherance of that conspiracy, (3) the firearm was used to cause the death of Burgos, and (4) the killing of Burgos was a murder. Meador admits that he provided a handgun to James and that James used it to shoot Burgos. Thus, sufficient evidence was presented to establish the first two elements of this offense, namely, that (1) Meador conspired to distribute and possess with intent to distribute marijuana, and

-12-

that (2) Meador knowingly possessed the .32 caliber handgun in furtherance of the conspiracy.  The remaining issues are whether there was sufficient evidence to prove that the handgun was used by James to cause the death of Burgos and that the killing of Burgos was a murder.  We conclude that the evidence was sufficient.

At Meador's trial, Dr. Michael Zaricor testified about the autopsy that he had performed on Burgos's body, stating that he found three bullet wounds. The first wound was made by a large caliber weapon, with the bullet entering in the left groin and exiting in the left buttock.  The second wound was also made by a large caliber weapon, this time with the bullet entering through the right ear and traveling along the scalp towards the rear of the skull.  The bullet then created a two-centimeter oval hole in the skull, forcing two large pieces of bone into the occipital lobe and leaving a small amount of lead in the brain.  The result was hemorrhage in the lateral ventricle and subarachnoid hemorrhage above the occipital lobe.  Dr. Zaricor testified that such a wound likely rendered Burgos unconscious, but not dead.  The third wound was caused by a smaller caliber weapon, with the bullet entering through the upper back by the first thoracic vertebra and exiting the front of the torso by the sixth rib.  The bullet traveled through Burgos's right lung, leaving a hemorrhagic track and a liter of clotted blood surrounding the lung.  Dr. Zaricor testified that the presence of the hemorrahagic track and the clotted blood indicated that Burgos's heart was beating at the time of the third gunshot wound.  Dr. Zaricor concluded that the second wound to the head was the main cause of death, but that it was supplemented by the blood loss from the third wound to the chest.  Thus, there was sufficient evidence to establish that the .32 caliber handgun used by James and provided by Meador caused the death of Burgos.

The remaining issue was whether the killing of Burgos was a murder.  James testified that he fired the handgun at what he thought was a corpse.  Meador contends that conviction under § 924(j)(1) requires a specific finding that the user of the firearm

-13-

acted with malice aforethought.  He argues that he cannot be convicted of count three because James lacked the requisite *mens rea* to commit murder.  We disagree.

To convict under § 924(j)(1), the government needs to show that (1) the firearm was used to cause the death of the victim and that (2) "the killing [wa]s a murder" as defined by 18 U.S.C. § 1111.  Section 1111 defines murder as "the unlawful killing of a human being with malice aforethought."  Thus, as we have said, a conviction under § 924(j)(1) requires a finding of malice aforethought.  United States v. Allen, 247 F.3d 741, 783 (8th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002).  Evidence of a subjective intention to kill, however, is not necessary for a showing of malice aforethought.  United States v. Black Elk, 579 F.2d 49, 51 (8th Cir. 1978) (citing United States v. Cox, 509 F.2d 390, 392 (D.C. Cir. 1974)); see United States v. Shaw, 701 F.2d 367 (5th. Cir. 1983).  Malice aforethought may be demonstrated objectively by reckless and wanton conduct, deviating grossly from the standard of care, of such a nature that a jury would be warranted in inferring the defendant's awareness of a serious risk of death or serious bodily harm.  Black Elk, 579 F.2d at 51; Cox, 509 F.2d at 390.

The evidence presented at trial was that James shot Burgos immediately after Dinwiddie fired his weapon.  The bullet entered Burgos's upper back, pierced his lung, and exited his rib cage.  Burgos's heart was beating when James shot him.  This was reckless and wanton conduct, deviating grossly from the standard of care.  The action was of such a nature that the jury was warranted in inferring that James should have been aware of a serious risk of death or serious bodily harm.  Thus, there was sufficient evidence to find that James shot Burgos with malice aforethought.  Because a reasonable jury could have found that James murdered Burgos, Meador's argument fails, even if his interpretation of § 924(j)(1) were correct.  Accordingly, the district court did not err in denying Meador's motion for judgment of acquittal on count three.

## C. Curtailment of Cross-Examination of James

Meador argues that his right to a fair trial was violated when the district court curtailed his cross-examination of James. We will not reverse a trial court's decision to limit cross-examination unless there has been a clear abuse of discretion and a showing of prejudice to the defendant. United States v. Willis, 997 F.2d 407, 415 (8th Cir. 1993).

The testimony at issue concerned whether James intended to murder Burgos. As discussed above, Meador reasoned that if both he and James lacked the requisite intent to murder Burgos, there could be no conviction for possession of a firearm in furtherance of a drug crime resulting in death. The district court curtailed the cross-examination of James when defense counsel sought to have James opine on whether he acted with "malice aforethought" or "callous disregard" when he shot Burgos. The court reasoned that it was inappropriate to have James discuss whether his mental state met a particular legal standard. The court noted that defense counsel had already provided evidence about what James believed when he shot Burgos and that James's mental state could be argued before the jury in closing arguments. This was a reasonable ruling by the court and one that did not result in prejudice to Meador. Accordingly, the court did not clearly abuse its discretion in ruling as it did.

## D. Admission of Out-of-Court Statements

Dinwiddie and Meador argue that the district court erred in admitting certain out-of-court statements. Dinwiddie argues that the district court erred by admitting out-of-court statements by Billy Meador, Michael Meador's brother, and Maria Alanis, Burgos's girlfriend. Meador argues that the district court erred by admitting out-of-court statements by James and Genalle Brown, Dinwiddie's girlfriend. We review the district court's admission of evidence for abuse of discretion. United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006). We review for clear error the

district court's finding that a statement was made in furtherance of a conspiracy. United States v. Beckman, 222 F.3d 512, 522-23 (8th Cir. 2000).

### 1. Testimony of Billy Meador and Alanis

Over Dinwiddie's objection, Billy Meador testified about the drug run that he had gone on with Burgos and Michael Meador in February 2006.  According to Billy, Burgos said that Dinwiddie had taken twenty-five pounds of marijuana from him and Burgos expressed displeasure with Dinwiddie.  The government argued that the statement was admissible under Federal Rule of Evidence 801(d)(2)(E) as a statement by a co-conspirator during the course and in furtherance of the conspiracy.

This statement was properly admissible because it was not hearsay.  First, hearsay is an out-of-court statement introduced to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  The statement was introduced to illuminate the dispute between Burgos and Dinwiddie; it was not introduced to prove that Dinwiddie actually stole twenty-five pounds of marijuana from Burgos or that Burgos was actually unhappy with Dinwiddie.  As such, it was not hearsay under Rule 801(c) and could be admitted on this ground.  Second, the statement was made in furtherance of the conspiracy and was not hearsay under Rule 801(d)(2)(E).  Billy and Michael Meador were traveling on a drug run with Burgos, while carrying the $10,000 and the handgun given to them by Dinwiddie for this purpose.  Burgos's discussion of his suspicions about Dinwiddie apprised Billy and Michael Meador about important current developments within the conspiracy.  Thus, the district court did not clearly err in determining that Burgos's statement was made in furtherance of the drug conspiracy and did not abuse its discretion in admitting the testimony.

Similarly, Alanis's testimony did not contain hearsay.  Alanis testified that Burgos had said that his associates in the drug trade were Meador and Dinwiddie. Alanis also testified that she had accompanied Burgos on drug runs, tracked shipments

-16-

for Burgos, and collected payments for drugs with Burgos.  On at least one of these trips, Alanis traveled with Burgos to a meeting with Meador and Dinwiddie where money was exchanged.  When Alanis traveled with Burgos on drug runs, she would register for the hotel rooms when they stayed overnight.  Alanis was a co-conspirator and Burgos's statements to her were made in furtherance of the conspiracy.  As such, they were not hearsay and properly admissible under Rule 801(d)(2)(E).

Accordingly, the district court neither clearly erred in determining that Burgos's statements to Billy Meador and Alanis were made in furtherance of the conspiracy, nor did it abuse its discretion when admitting these statements.  In any event, any error in admitting the statements would have been harmless.  There was overwhelming evidence at trial of the dispute between Burgos and Dinwiddie and that Burgos had dealt drugs with Dinwiddie and Meador.  Dinwiddie has not shown that inclusion of these statements caused him prejudice.[4]

---

[4]Dinwiddie makes a cursory argument that admission of testimony relating Burgos's statements violated the Confrontation Clause of the Sixth Amendment. Statements made by co-conspirators in the furtherance of a conspiracy are generally admissible because they are nontestimonial and accordingly the Confrontation Clause does not prohibit their admission.  Crawford v. Washington, 541 U.S. 36, 68 (2007); United States v. Avila Vargas, 570 F.3d 1004, 1009 (8th Cir. 2009).  The statements by Burgos to Billy Meador and Alanis were informal out-of-court conversations and nontestimonial in nature.  Moreover, Burgos was unavailable because Dinwiddie had murdered him.

## 2. Testimony of James and Brown

Meador argues that the district court erred in admitting statements by James and Brown concerning statements that Dinwiddie had made about his disagreement with Burgos.  Meador argues that James and Brown were not members of the drug conspiracy, and thus their testimony about Dinwiddie's statements was not admissible under Rule 801(d)(2)(E).

Meador's argument is based upon the mistaken impression that Rule 801(d)(2)(E) requires that the testifying witness be a co-conspirator.  Under Rule 801(d)(2)(E), the relevant inquiry is (1) whether the declarant and the defendant were members of the conspiracy and (2) whether the declarant made the statements in the course of and in furtherance of the conspiracy.  United States v. Frazier, 280 F.3d 835, 848 (8th Cir. 2002); see also United States v. Mahasin, 362 F.3d 1071, 1084 (8th Cir. 2004).  The declarant is the person who purportedly made the statement.  Fed. R. Evid. 801(b).  For the purposes of Rule 801(d)(2)(E), it is irrelevant whether the witness was a member of the conspiracy or acting in furtherance of the conspiracy.  Frazier, 280 F.3d at 848; see United States v. Manfre, 368 F.3d 832, 837 (8th Cir. 2004) ("The statement need not be made by one conspirator to another conspirator.").

Rule 801(d)(2)(E)'s inquiry is satisfied because (1) Meador, the defendant, and Dinwiddie, the declarant, were members of a drug distribution conspiracy; and (2) the statements were made in the course of and in furtherance of the conspiracy.  Dinwiddie made the statements to James during the trip to Missouri to confront Burgos about the lost $10,000.  As discussed above, this trip was made in furtherance of the conspiracy.  James was supporting Dinwiddie in this enforcement action.  Dinwiddie made these statements to James to apprise him of the situation as they traveled to Missouri to confront Burgos about the missing money.  Likewise, Dinwiddie made statements to Brown about his disagreement with Burgos and acquired from her the .45 caliber handgun used to murder Burgos.  Dinwiddie's

-18-

statements to Brown explained his rationale for proceeding to Missouri and his need for a firearm.  Thus, they were made in furtherance of the conspiracy and properly admitted under Rule 801(d)(2)(E).  Even if they were admitted in error, any error would have been harmless given the overwhelming evidence of the conspiracy between Dinwiddie and Meador and the dispute with Burgos.[5]

### E.  Conviction and Sentencing Under 18 U.S.C. § 924

Dinwiddie and Meador argue that the district court erred in sentencing them on count three under 18 U.S.C. § 924.  This claim was not raised below.  Accordingly, we review it for plain error.  United States v. Marcus, 130 S. Ct. 2159, 2164 (2010); Hodge, 594 F.3d at 619.

Section 924(c)(1) provides for additional mandatory minimum sentences for use of firearms in drug trafficking crimes.  Under § 924(c)(1)(A)(i)-(iii), possession of a firearm mandates an additional five-year sentence; brandishing a firearm mandates an additional seven-year sentence; and discharging a firearm mandates an additional ten-year sentence.  According to § 924(c)(1)(D), all such additional sentences are to run consecutively to the sentence for the underlying drug trafficking crime.  Section 924(j) provides the sentences when a death results from a violation of § 924(c).  If the killing

---

[5]Meador argues that the district court erred by failing to follow the procedure outlined in United States v. Bell for admission of out-of-court statements by co-conspirators.  573 F.2d 1040, 1044 (8th Cir. 1978).  A trial court, however, is not required to make a separate, explicit Bell ruling if it substantially complies with Bell's procedures.  United States v. Johnson, 535 F.3d 892, 897 (8th Cir. 2008).  Meador failed to specifically request a Bell ruling, but moved for acquittal on the grounds of the sufficiency of the evidence. The district court denied this motion.  Accordingly, we consider the district court to have substantially complied with Bell and thus we review for plain error.  Id.  As discussed above, the admission of the statements was not clearly erroneous.  Contrary to Meador's assertion, no miscarriage of justice occurred.

is a murder, then the sentence shall be death or imprisonment for any term of years or for life.  18 U.S.C. § 924(j)(1).

Count three of the superseding indictment alleged that Dinwiddie and Meador knowingly possessed a firearm in furtherance of a drug trafficking crime, namely, conspiracy to distribute and possess with intent to distribute marijuana.  The indictment alleged that in the course of committing that crime, Dinwiddie and Meador caused the death of Burgos through the use of a firearm.  The indictment further alleged that the killing of Burgos occurred "with malice aforethought [and] was a murder."  The indictment concluded that Dinwiddie and Meador had acted "[i]n violation of Title 18, United States Code, Section 924(c)(1), and punishable under Title 18, United States Code, Section 924(j)(1)."

Dinwiddie and Meador make two arguments concerning the interplay of § 924(c) and § 924(j).  First, they argue that the indictment was insufficient because § 924(c) and § 924(j) "charge two separate offenses with two distinct penalty provisions."  Accordingly, they allege a violation of their Fifth Amendment right to be tried and sentenced only for the crime for which they were indicted.  Dinwiddie and Meador did not raise this issue before trial, and it is therefore waived.  United States v. Davis, 103 F.3d 660, 674 (8th Cir. 1996).  Even were it not waived, this claim would fail because the indictment was sufficient to put Dinwiddie and Meador on notice as to the offense charged.  See United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008).

Second, Dinwiddie and Meador argue that the district court erred in sentencing them to a consecutive life sentence under § 924(j).  They argue that the consecutive sentence provision of § 924(c) does not apply to sentences under § 924(j).  We have previously rejected this interpretation of § 924(j).  Allen, 247 F.3d at 769.  As we noted in Allen, Dinwiddie and Meador's interpretation "of § 924(j) would lead to the odd result that a defendant convicted under § 924(c) is subject to an additional

-20-

consecutive sentence only in situations that do not result in a death caused by use of the firearm." Id.; see also United States v. Battle, 289 F.3d 661, 669 (10th Cir. 2002). Accordingly, any error in sentencing was neither clear nor obvious and thus would not warrant relief on review for plain error. Hodge, 594 F.3d at 619.[6]

### F.  Sentencing Under the Armed Career Criminal Act

Dinwiddie argues that the district court improperly sentenced him as an armed career criminal under 18 U.S.C. § 924(e).  He claims that his prior convictions for criminal facilitation of robbery and kidnapping, in violation of Kentucky Revised Statutes §§ 506.080, 509.040, and 515.020, are not violent felonies within the meaning of 18 U.S.C. § 922(e)(1).

We need not resolve this issue, for any error in sentencing on count four under U.S.S.G. § 4B1.4 would not affect the life sentence on count two and the consecutive life sentence on count three.  This is equally true whether or not Dinwiddie qualified as a career offender under U.S.S.G. § 4B1.1.  The guideline range was life imprisonment, regardless of his criminal history category.  Any error in sentencing based upon the Armed Career Criminal Act or career offender provisions was therefore harmless. See Clay, 579 F.3d at 933 (applying harmless error analysis to sentencing error when it would not affect life sentence properly imposed on other count of conviction).

---

[6]Dinwiddie and Meador cite one of our recent cases involving conviction under § 924(o) and sentencing under § 924(c) that is arguably inconsistent with our analysis in Allen.  See United States v. Clay, 579 F.3d 919, 933 (8th Cir. 2009), cert. denied, 130 S. Ct. 3353 (2010).  Clay did not, nor could it, overrule Allen, and thus we see no need to address the matter further.

III.

The judgment is affirmed.

_____

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 25, 2010

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  09-2154  United States v. Dennis Dinwiddie

Dear Sirs:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellant was Michael J. Gorla, of St. Louis, MO. The following attorney(s) appeared on the appellant brief:  Jennifer Herndon, of Florissant, MO.

Counsel who presented argument on behalf of the appellee was Cristian M. Stevens, AUSA, of St. Louis, MO.  Appearing on the brief was Thomas E. Dittmeier, AUSA, of St. Louis, MO.

The judge who heard the case in the district court was Honorable Catherine D. Perry. The judgment of the district court was entered on May 6, 2009.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

PAW

Enclosure(s)

cc:  Lois Law
     MO Lawyers Weekly

District Court/Agency Case Number(s):   1:06-cr-00134-CDP-2

# United States Court of Appeals
## *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
www.ca8.uscourts.gov

August 25, 2010

Mr. Michael J. Gorla
Suite 1630
720 Olive Street
St. Louis, MO  63101-0000

Mr. Christopher E. McGraugh
LERITZ & PLUNKERT
555 Washington Avenue
Suite 600
St. Louis, MO  63101-0000

      RE:  09-2154  United States v. Dennis Dinwiddie

Dear Counsel:

      The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00a.m. today. Please hold the opinion in confidence until that time.

      Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

      Michael E. Gans
      Clerk of Court

PAW

Enclosure(s)

cc:    Mr. Dennis Dinwiddie
       Mr. Thomas E. Dittmeier
       Ms. Jennifer Herndon
       Mr. Cristian Matthew Stevens
       Mr. James G. Woodward

District Court/Agency Case Number(s):   1:06-cr-00134-CDP-2

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

**Michael E. Gans**
*Clerk of Court*

August 25, 2010

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

      RE:  09-2154  United States v. Dennis Dinwiddie
          09-2649  United States v. Michael D. Meador

Dear Sirs:

     A published opinion was filed today in the above case.

     Counsel who presented argument on behalf of  appellant Dinwiddie was
Michael J. Gorla, of St. Louis, MO. The following attorney(s) appeared on the appellant brief:
Jennifer Herndon, of Florissant, MO.  Arguing for appellant Meador was Christopher E.
McGraugh of St. Louis, MO.

     Counsel who presented argument on behalf of the appellee was Cristian M. Stevens,
AUSA, of St. Louis, MO.  Appearing on the brief was Thomas E. Dittmeier, AUSA, of St. Louis,
MO.

     The judge who heard the case in the district court was Honorable Catherine D. Perry. The
judgment of the district court was entered on May 6, 2009.

     If you have any questions concerning this case, please call this office.

                              Michael E. Gans
                              Clerk of Court

PAW

Enclosure(s)

cc:  Lois Law
     MO Lawyers Weekly

      District Court/Agency Case Number(s):   1:06-cr-00134-CDP-2

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 25, 2010

Mr. Michael J. Gorla
Suite 1630
720 Olive Street
St. Louis, MO  63101-0000

Mr. Christopher E. McGraugh
LERITZ & PLUNKERT
555 Washington Avenue
Suite 600
St. Louis, MO  63101-0000

      RE:  09-2154  United States v. Dennis Dinwiddie
           09-2649  United States v. Michael D. Meador

Dear Counsel:

      The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00a.m. today. Please hold the opinion in confidence until that time.

      Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

                        Michael E. Gans
                        Clerk of Court

PAW

Enclosure(s)

cc:   Mr. Dennis Dinwiddie
       Mr. Thomas E. Dittmeier
       Ms. Jennifer Herndon

Mr. Cristian Matthew Stevens
Mr. James G. Woodward

District Court/Agency Case Number(s):   1:06-cr-00134-CDP-2